Whitaker, Judge,
delivered the opinion of the court:
Plaintiff sues defendant for compensation for the carriage of mails for the period June 26,1946 to December 9, 1946.
Plaintiff, a New Jersey corporation, time-chartered six vessels from Empresa Hondurena de Vapores, a Honduran company, which was a wholly-owned subsidiary of plaintiff. The vessels, of course, flew the flag of Honduras and were operated under the laws of that country.
During the period in question the vessels transported for defendant certain so-called convention mails and non-con *316 vention mails. Plaintiff has been paid for carrying the non-convention mails, but not for carrying the convention mails. These mails were carried from New Orleans and Cristobal, Canal Zone, to ports in Panama, Costa Pica, Honduras, Nicaragua, El Salvador, and Guatemala. All of these countries, as well as the United States of America, were parties to the Convention of the Postal Union of the Americas and Spain.
• Article 3 of this Convention, entered into in 1937 (50 Stat. 1657), reads as follows:
1. The gratuity of territorial, fluvial and maritime transit is absolute in the territory of the Postal Union of the Americas and Spain; consequently, the countries which form it obligate themselves to transport across their territories, and to convey by the ships of their registry or flag which they utilize for the transportation of their own correspondence, without any charge whatsoever to the contracting countries, all that which the latter send to any destination.
2. In cases of reforwarding, the contracting countries are bound to reforward the correspondence by the ways and means which they utilize for their own dispatches.
■ Such mails are called convention mails. Plaintiff sues for the carrying of them.
Similar suits have been before us heretofore, but each of them, and this action as well, differ in some respects. In United Fruit Co. v. United States, reported in 103 C. Cls. 303, 308, et seq., there was involved the carriage of mails by vessels flying the flag of Panama. Notwithstanding article 3 of the Convention quoted above, Panama denied liability for compensation for the carrying of them. We held that since the United States had required the carriage, and since Panama would not pay, the United States was liable. .
On the same day we decided Standard Fruit and Steamship Co. v. United States, also reported in 103 C. Cls. 659, 680, et seq. This suit involved the carriage of mails by vessels flying the flag of Honduras. Honduras did not deny liability to pay compensation therefor, and prior to their carriage the United States had disclaimed liability. Notwithstanding the non-acquiescence of plaintiff in this disclaimer, we held that there was no implied promise by the *317 United States to pay for them, and we gave judgment for the defendant. Honduras later paid plaintiff.
In United Fruit Co. v. United States, 112 C. Cls. 519, 528, et seq., there was also involved the carriage of mails by vessels flying the flag of Panama. Defendant defended on the ground that the United States had disclaimed liability before the mails were carried. It, however, appeared that plaintiff had vigorously protested this disclaimer of liability, and it did not appear that the United States had persisted in its disclaimer in the face of this protest. Under these circumstances, and because Panama denied liability, we held that a promise to pay must be implied, especially since it was not within the power of the plaintiff to refuse to carry the convention mails, since they were commingled with the non-convention mails, which plaintiff was under the duty to carry.
Now, in the case at bar there was also a disclaimer of liability by the United States, and continued protest by the plaintiff, without any resolution of the dispute at the time the mails here involved were carried. However, on August 30, 1954 the Ministry of Foreign Eelations of the Kepublic of Honduras advised the United States Minister to Honduras, in part, as follows:
* * * When your Ministry, through the National Merchant Marine Bureau, grants a navigation license and registry, the company or owner of the vessel is required “To waive any claim for transportation of mail delivered to it by the countries signatory to the Postal Union of the Americas and Spain,” whence it is concluded that the Government of Honduras grants licenses to vessels of the said companies or private persons on condition that they transport the aforesaid mail in exchange for exemption from beacon, wharfage, and tonnage charges, subsidies, etc. * * *
Later, on October 4, 1954, the president of Empresa Hon-durena de Vapores, the owner of the vessels transporting the mails, wrote the Postal Administrator of Puerto Cortes, Kepublic of Honduras, in part as follows:
As far as I know, the only provision in effect on the subject is that indicated in Article 114, subparagraph 3, of Legislative Decree No. 45 of 1943, cited in the verbal *318 note mentioned. In some contracts for the transportation of mail executed prior to the year 1943, between the Executive Power and steamship companies, the latter assumed the obligation of making the said transportation without any cost to the Government in exchange for the exemption from the payment of port charges, such as anchorage, clearance, lighthouse,. etc.; see the contract with The Pacific Steam Navigation Company and that with the Compania Naviera del Pacifico, “Grace Line,” both of the year 1937, published in Nos. 10226 and 10262 of the official daily “La Gaceta” of the said year.
In regard to vessels of Honduran registry referred to in the preamble of the aforementioned transcription, whether they navigate in national waters or in those of other countries, they are obligated to carry gratis the mail from Honduras and to Honduras, in accordance with subparagraph 5 of Article 114 of the Postal Law.
It would, therefore, appear that the [Republic of Honduras, which was liable for the payment for the carriage of the mails under article 3 of the Postal Convention, has paid for their carriage by exempting plaintiff’s vessels from beacon, wharfage and tonnage charges, and by subsidies, etc.
Plaintiff, having collected in this way from Honduras for the carriage of the mails, is not entitled to collect again from the United States. It is the Republic of Honduras that is primarly liable under the Postal Convention for the carriage of these mails, and it has paid for it in the way stated above.
The aforementioned correspondence was written after the period in question, but we assume it is a statement of the conditions on which the vessels were licensed originally.
Plaintiff also says the Republic of Honduras is liable to pay for the carriage of these mails only if that country utilized these vessels for the carriage of its own mails on the particular voyages when the United States utilized these vessels for the carriage of its mails. Article 3 of the Postal Convention is not so limited. Nor does Honduras undertake to so restrict its liability, as shown by the communication from its Ministry of Foreign Relations quoted from above. Neither does the owner of the vessels undertake to so restrict its liability, as shown by the extract from his letter set out above.
*319 Plaintiff says that in Standard Fruit and Steamship Co. v. United States, 103 C. Cls. 659, 684, we denied the counterclaim of the United States for money the United States had already paid the plaintiff in that case, based on the provisions of a contract between Honduras and the Standard Fruit and Steamship Company requiring the vessels to carry the mails to and from Honduras without charge, in consideration of certain concessions granted. We pointed out in that case that the contract was not made for the benefit of the United States and, hence, the United States could not maintain an action on it.
Such a holding is, of course, quite different from a holding that the present plaintiff is not entitled to collect twice for the carriage of the mails. The Standard Fruit and Steamship Company did collect twice, but, even so, we could find no basis for a recovery by the United States of the money it had paid. The period involved in the counterclaim was from 1919 to 1942, and, hence, some of these mails were carried prior to the Postal Convention of 1932, renewed in 1937, and some thereafter. The Government’s claim did not disclose how much was carried before and how much afterwards.
Piad the United States not paid for the mails carried after the Convention, and the Standard Fruit and Steamship Company had sued for the carriage thereof, we would have denied it recovery, even as we do in the present case. However, on the case presented we could find no basis for recovery by defendant.
Plaintiff’s petition will be dismissed.
It is so ordered.
LakamoRe, Judge/ Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OP PACT
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a New Jersey corporation which, at all times pertinent to this action, was the beneficial owner of all the capital stock issued and outstanding of Empresa *320 Hondurena de Valores (hereinafter called Empresa), a corporation organized and existing under the laws of the Ke-public of Honduras. Since Empresa was organized on March IT, 1941, it has been a wholly owned subsidiary of plaintiff.
2. During the period involved in this case, i. e., June 26, 1946 to December 9, 1946, inclusive, plaintiff operated six vessels owned by Empresa under time charters executed by that corporation as owner and plaintiff as charterer. As shown by plaintiff’s exhibit 1-B, the agreements contained the provisions customarily found in time charters. Each of the charters provided that the owner would provide and pay for the wages of the captain, officers, engineers, firemen, and crew, and that the charterer would pay a stipulated monthly charter hire. The charter for each vessel further provided that cargoes were to be laden or discharged in any dock, wharf, or place that the charterer directed; that the whole reach of the vessel, including holds, decks, and places of loading, would be at the disposal of the charterer; that the charterer was to pay for all fuel, fresh water, and other expenses, except those pertaining to the crew; that the captain, although appointed by the owner, would be under the orders and directions of the charterer; that the charterer would load, stow, and trim the cargo at its expense under the supervision of the captain; that the charterer was to furnish instructions and sailing directions from time to time; that the charterer was to provide and pay for insurance on the vessels’ hull, machinery, furniture, and fittings, and that the agreement was not to be construed as a demise of the vessel to the time charterer.
Each of the six vessels was registered under the flag of the Eepublic of Honduras.
Under such time charters to plaintiff, five of the vessels were operated from the port of New Orleans, Louisiana, to ports in Cuba, Guatemala, Honduras, and Panama. One vessel was operated from Cristobal, Panama Canal Zone, to West Coast ports in the countries of Panama, Costa Rica, Honduras, Nicaragua, El Salvador, and Guatemala. During its operation of the vessels, plaintiff transported cargo and mail and, in its name, issued tickets for passengers and *321 bills of lading for cargo. Correspondence respecting the transportation of mail carried on the vessels was conducted between plaintiff and the United States Post Office Department.
3. From June 26,1946, to December 9,1946, the postmaster at New Orleans tendered mails to plaintiff for transportation on the vessels chartered to it to ports in Guatemala, Cuba, Honduras, and Panama. The Director of Posts, Panama Canal Zone, also tendered mail to plaintiff at Cristobal for transportation on one of the vessels to the West Coast ports of Panama, Costa Rica, Honduras, Nicaragua, El Salvador, and Guatemala.
4. Sections 2251 and 2254 of the Postal Laws and Regulations (Edition of 1940), effective June 26, 1946, to December 31,1946, insofar as pertinent herein, read as follows:
2251. All letters or other mailable matter conveyed to or from any part of the United States by any foreign vessel, except such sealed letters relating to such vessel or any part of the cargo thereof as may be directed to the owners or consignees of the vessel, shall be subject to postage charge, whether addressed to any person in the United States or elsewhere, provided they are conveyed by the packet or other ship of a foreign country imposing postage on letters or other mailable matter conveyed to or from such country by any vessel of the United States; and such letters or other mailable matter carried in foreign vessels, except such sealed letters relating to the vessel or any part of the cargo thereof as may be directed to the owners or consignees, shall be delivered into the United States post office by the master or other person having charge or control of such vessel when arriving, and be taken from the United States post office when departing, and the postage justly chargeable by law paid thereon; and for refusing or failing to do so, or for conveying such letters or other mailable matter, or any letters or other mailable matter, intended to be conveyed in any vessel of such foreign country, over or across the United States, or any portion thereof, the party offending shall be fined not more than one thousand dollars.
2. Mails for dispatch by outgoing steamers shall be delivered from the post office and steamship companies shall haul the sacks to the steamers. Each truck (or wagon) shall be provided with a man to ride on the rear and protect the mail. The red-label sacks shall be *322 separately delivered to the steamship company’s representative at the post office; sacks and seals shall be carefully examined at time of receipt; and when a rack (open) truck is used the sacks shall be covered by a tarpaulin. The registered (red label) sacks shall be specially protected during transfers and on board vessels. Unless special arrangements are made, mails shall be ready for delivery at the post office in time, designated by the postmaster, to connect with the conveying steamer.
2254. The Postmaster General may impose or remit fines on contractors or carriers transporting the mails by air or water on routes extending beyond the borders of the United States for any unreasonable or unnecessary delay to such mails and for other delinquencies in the transportation of the mails.
2. Steamship companies shall be answerable to the United States for the safety of the mail intrusted to them, and accountable for any loss or damage resulting to any of such mail by reason of failure on the part of any of their officers, agents, or employees to exercise due care in the custody, handling, or transportation thereof. In case of delinquencies, fines may be imposed or deductions made from the company’s pay.
5. Article 3 of the Convention of the Postal Union of the Americas and Spain (50 Stat. 1657), entered into in 1937 between the United States of America, Spain, and the Central and South American countries, and in effect during the period involved in this suit, provided as follows:
1. The gratuity of territorial, fluvial and maritime transit is absolute in the territory of the Postal Union of the Americas and Spain; consequently, the countries which form it obligate themselves to transport across their territories, and to convey by the ships of their registry or flag which they utilize for the transportation of their own correspondence, without any charge whatsoever to the contracting countries, all that which the latter send to any destination.
2. In cases of reforwarding, the contracting countries are bound to reforward the correspondence by the ways and means which they utilize for their own dispatches.
6. The mails transported by plaintiff on the vessels chartered from Empresa were classed by the Post Office Department as letter mails, prints, registered mails, and parcel post. Some of the mails in the several classifications trans *323 ported by plaintiff were of United States origin, while other mails in the same classifications were foreign transit closed mails, i. e., closed mails originating in foreign countries and destined to other foreign countries. The mails were transported by plaintiff either from New Orleans or from Cristo-bal, Canal Zone, to foreign ports at which plaintiff’s vessels were expected to call.
7. Plaintiff received the mails tendered by defendant in New Orleans at the post office platforms, from which locations plaintiff moved the mails to shipside and loaded them aboard the steamers. The mails tendered by the Director of Posts at Cristobal, Panama Canal Zone, were received by plaintiff at shipside.
All of the mails tendered to and transported by plaintiff were accompanied by post office waybills. The “waybill of registered sacks” showed in detail the country of origin, the post office of destination, and the number of sacks of letters, prints, or parcel post. In addition to the waybill covering the registered mails, there was a waybill which showed the port at which plaintiff received the mails, the name of the vessel transporting the mails, her sailing date, and the port of call. This waybill also showed the total number of sacks of mail designated as “letters and prints” and as “parcel post” for both United States mails and foreign transit closed mails, but there was no information as to the country of origin for any mail listed on the waybill as foreign transit closed mails.
8. The mails tendered to and transported by plaintiff, as above described, originated in countries which were signatories to the 1937 Convention of the Postal Union of Americas and Spain, as well as in nonsignatory countries. However, except for the registered mails, there was nothing on the waybills to indicate the origin or destination of the foreign transit closed mails. Several weeks after sailing, plaintiff was furnished by the postmasters with two weight statements. One of the statements listed the weights for (a) letters, (b) prints, and (c) parcel post originating in non-signatory countries, and the other statement set forth the weights for (a) letters, and (b) prints originating in signatory countries. The weight statements showed the weight *324 of all mails transported without reference to the number of sacks shown on the post office waybills previously issued to plaintiff, and there was no segregation of the weights of the registered mails from the unregistered mails. Thus, except for parcel post, there was no way in which plaintiff could reconcile the weight statements with the description of the mails shown on the waybills.
9. Pursuant to Article 3 of the 1937 Convention, the Post Office Department refused to pay plaintiff for the transportation of letters and prints designated as foreign transit mails originating in countries signatory to the Convention.
Plaintiff has been compensated for the transportation of foreign transit mails originating in nonsignatory countries and for the transportation of parcel post. The 1937 Convention did not cover parcel post.
10. Prior to 1942, plaintiff was notified by the United States Post Office that it would not pay plaintiff for the conveyance of mails on United Fruit Company steamships which flew the flag of the Eepublic of Honduras. By letter dated October 8, 1942, plaintiff notified the United States Post Office Department that plaintiff would demand payment from that department for all mails tendered by it and transported by plaintiff as required in the Postal Laws and Regulations at the rates fixed in such regulations. Since 1942, plaintiff and defendant have been in continuing disagreement with respect to the liability of defendant for the transportation of mails delivered by the United States Post Office and carried on the Honduran flag vessels operated by plaintiff.
11. At the time the vessels, which transported the mails involved in this action, were chartered to plaintiff, W. L. Tail-Ion and J. Felix Aycock were president and general manager, respectively, of Empresa. The evidence indicates that both were citizens of the United States. With respect to the Honduran flag steamers time-chartered to plaintiff, W. L. Taillon, as president of Empresa, wrote the Secretary of State in the Portfolios of Fomento, Agriculture, Labor, and Commerce of the Republic of Honduras, a letter dated September 4, 1941, which in English translation reads as follows:
*325 In my character of President of the Board of Directors and general representative in this country of the Empresa Hondurena de Vapores, owner of the vessels “NICHOLAS CUNEO”, “GUARDIAN”, “BAJA CALIFORNIA”, “choluteca”, “comayagua”, “olancho”, “sinaloa”, “aRGUAl”, “castilla”, “CHIRRIPO”, “FRANCIS R. HART”, “iriona”, “orotava”, “sagua”, “tanamo”, “t e l a”, “telde”, “maya”, “aztec” and “toltec”, which have been matriculated under the Honduran flag; and with the object of harmonizing the interests of the Government of this country with those of the Company which I represent, I have the honor in the name of the latter to convey to you the fact that the Empresa Hondurena de Vapores offers and agrees, as long as the said vessels remain under the Honduran flag, not to collect from the Government of Honduras, directly or indirectly, any amount for the transportation of mail on the said vessels, whether it be from Honduran ports or from foreign ports, not only for that which proceeds from Honduras but also for that which may come destined to this country, or that which may be exchanged between foreign ports, so that Honduras may be protected against any collection for the transportation of mail on said vessels which may be made against your Government as a consequence of the effects of the two paragraphs of article three of the Postal Convention of the Americas and Spain signed in Panama in the year 1937, the Government of the Republic of Honduras therefore remaining exempt from all payment for the transportation of such mail on the ves- . seis heretofore mentioned, in so far as it concerns the Empresa Hondurena de Vapores.
I believe that in this way the interests of the Government of the Republic are fully protected with respect to said payments.
* * * * *
12. The Republic of Honduras, by a note dated August 30, 1954, from the Ministry of Foreign Relations of the Republic of Honduras to the United States Embassy, forwarded a. report from the Minister of Development of the Republic of Honduras, dated August 27, 1954, which, in turn, incorporated a report from the Post Office Department of the Republic of Honduras to the Minister of Development. The report was dated August 26,1954, and, in English, reads as follows:
*326 Mr. Minister : I respectfully reply to your communication no. 559 of the 31st of last month, in which you are good enough to transcribe for this Department communication no. 35502 A. G. from the Ministry of Foreign Relations, which in turn does the same with a communication from the American Embassy in Honduras, relating to the free transportation of mail in exchange for port privileges granted in Honduran ports and without consideration of Article 3 of the PUAS. In this connection I take the liberty of informing Your Excellency that I am replying to the said communication only today because I desired to obtain information from the administrations of the North Coast and from your Ministry, which at the present time is charged with the issuance of navigation licenses. When your Ministry, through the National Merchant Marine Bureau, grants a navigation license and registry, the company or owner of the vessel is required “To waive any claim for transportation of mail delivered to it by the countries signatory to the Postal Union of the Americas and Spain,” whence it is concluded that the Government of Honduras grants licenses to vessels of the said companies or private persons on condition that they transport the aforesaid mail in exchange for exemption from beacon, wharfage, and tonnage charges, subsidies, etc., according to information from the Collector of Revenue of Tela, through the Postmaster of the same place. Consequently, Article 114 of the Postal Law is in force. With all consideration and esteem, I am, Mr. Minister, Your obedient and humble servant, Celeo Murillo Soto, Postmaster General. * * *
13. The views of President Taillon of Empresa ón this note are conveyed in a letter dated October 4, 1954, to the Postal Administrator of Puerto Cortes, Republic of Honduras, which, in English, reads as follows:
“In your note No. 40, dated August 10 of the current year, you transcribe to me the contents of verbal Note No. 14 from the American Embassy addressed to the Secretariat of Foreign Relations, in which, making reference to Note No. 150 of the same Embassy, dated the 31st of March ultimo, information is requested on whether there exist any laws or regulations from the Honduran Government at present in effect requiring vessels, whether they be of the registry of nations members of the Postal Union of the Americas and Spain (PUAS) *327 or not, to carry gratuitously the mails in exchange for port privileges granted in Honduran ports and without consideration to Article 3 of the Convention of PUAS.
As far as I know, the only provision in effect on the subject is that indicated in Article 114, subparagraph 3, of Legislative Decree No. 45 of 1943, cited in the verbal note mentioned. In some contracts for the transportation of mail executed prior to the year 1943, between the Executive Power and steamship companies, the latter assumed the obligation of making the said transportation without any cost to the Government in exchange for the exemption from the payment of port charges, such as anchorage, clearance, lighthouse, etc.; see the contract with The Pacific Steam Navigation Company and that with the Compania Naviera del Pacifico, “Grace Line,” both of the year 1937, published in Nos. 10226 and 10262 of the official daily “La Gaceta” of the said year.
In regard to vessels of Honduran registry referred to in the preamble of the aforementioned transcription, whether they navigate in national waters or in those of other countries, they are obligated to carry gratis the mail from Honduras and to Honduras, in accordance with subparagraph 5 of Article 114 of the Postal Law.
Not having anything further to state, I am pleased to subscribe myself as your attentive and sure servant.
14. As stated in finding 2, some of the voyages made by the vessels chartered by plaintiff from Empresa included calls at ports in the Eepublic of Honduras. However, there is no evidence that any of these vessels were utilized by the Eepublic of Honduras for the transportation of its mails outbound from a port in Honduras on these voyages.
On the other hand, the evidence shows that on certain voyages during the period pertinent to this suit, some of the chartered vessels carried foreign transit closed mails originating in Honduras, as well as certain mails originating in other countries and addressed to post offices in Honduras. The waybill of registered sacks of mail carried by the steamer Aztec, which departed from New Orleans on August 28, 1946, on a voyage to Havana, Cuba, listed one sack of prints from the post office in New York addressed to the post office at Puerto Cortes, Honduras, and one sack of prints from the post office at New York addressed to the post office at Tegucigalpa, Honduras. After the voyage had been com *328 pleted, the Post Office Department sent plaintiff a statement of weights showing that among the foreign transit closed mails transported from New Orleans to Havana on that voyage, there were 12 pounds of prints which originated in Honduras and were destined for Cuba.
The waybill of registered sacks of mail for the steamer Maya, which departed from New Orleans on September 4, 1946, on a voyage to Havana, Cuba, listed two sacks of prints from the post office at New York addressed to the post office at Tegucigalpa, Honduras. After the voyage was completed, the Post Office Department sent plaintiff a statement of weights showing that the foreign transit mails transported on the voyage to Havana included 15 pounds of prints which originated in Honduras and were destined for Cuba.
The waybill of registered sacks of mail for the steamer Maya, which departed from New Orleans on November 2, 1946, on a voyage to Tela, Honduras, listed one sack of letters from the post office at London, England, addressed to the post office at Puerto Cortes, Honduras. Following completion of the voyage, the Post Office Department sent plaintiff a statement of weights showing that among the foreign transit closed mails transported from New Orleans to Tela, Honduras, there were 4,689 pounds of prints which originated in Cuba, Argentina, and Mexico, and were destined for Honduras.
The waybill of registered sacks of mail for the steamer Iriona, which departed from New Orleans on December 9, 1946, on a voyage to Puerto Cortes, Honduras, listed three sacks of letters from the post office at New Orleans, Louisiana, addressed to the post office at Tegucigalpa, and one sack of letters from the post office at New Orleans addressed to the post office at Puerto Cortes, Honduras. Following completion of the voyage, the Post Office Department sent plaintiff a statement of weights showing that the foreign transit mails transported on the voyage to Puerto Cortes included 39 pounds of prints originating in Mexico and Spain and which were destined for Honduras.
15. At the Convention of the Postal Union of the Americas and Spain, which was held in Bio de Janeiro in 1946, the Chief of the U. S. Delegation made a proposal on behalf *329 of tlie United States that Article 3 of the Convention adopted in 1937 be modified by eliminating therefrom the words “which they utilize for the transportation of their own correspondence.” This proposal was adopted unanimously and went into effect on January 1, 1947. Plaintiff does not claim compensation for the transportation of any mail after that date.
The proceedings at the Convention in Kio de Janeiro were conducted in Spanish. The proposal of the Chief Delegate of. the United States was read in English and translated by an interpreter into Spanish. After the Convention ended, the Chief Delegate from the United States decided that the minutes were somewhat confusing. Accordingly, he wrote the following statement, representing the position of the United States, and handed it to the Secretariat of the Convention :
There apparently has been some misunderstanding or misinterpretation of Article 3 of the Convention. It has been generally understood that the only exception to the principle of free transit is where the transportation of the mails requires the intermediary of countries or services foreign to the Americo-Spanish Postal Union and such transportation has to be paid for.
In some instances this misinterpretation has resulted in court action being brought against the United States Government and has resulted in expense to the Post Office Department.
It is our opinion that the words “which they utilize for the transportation of their own correspondence” were placed in Article 3 only to insure that each country gives as prompt dispatch to the mails of other signatory countries as they do to their own mails.
The United States Delegation, therefore, desires that the words “which they utilize for the transportation of their own correspondence” be eliminated.
(Signed) John J. Gillen,

Chief, United States Delegation.

CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and its petition is therefore dismissed.